*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ARMONTE JAVON MCCALEB,

        Defendant-Appellant.

UNPUBLISHED
August 10, 2026
12:01 PM

No. 372764
Kent Circuit Court
LC No. 22-005158-FC

Before: BOONSTRA, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Defendant, Armonte Javon McCaleb, appeals by right following his jury-trial convictions on one count of second-degree murder, MCL 750.317, two counts of assault with intent to murder, MCL 750.83, and three counts of carrying a firearm during the commission of a felony, MCL 750.227b(1). On appeal, defendant raises two issues. First, he contends that the evidence was insufficient to support his convictions. Second, he contends that prosecutorial misconduct during closing argument deprived him of the right to a fair trial. For the reasons stated in this opinion, we disagree with defendant's arguments and therefore affirm.

## I. BACKGROUND AND FACTS

This case arises out of a drive-by shooting on Highland Street in Grand Rapids on October 1, 2021. Three friends—Daaryon Love, Jaden Brown, and Anthony McConer, Jr.—were seated in a car parked on the street. As a white Jeep drove past, the front passenger leaned out of the Jeep's window, said, "Hey, my n****r," and fired at the parked car, killing McConer.

The shooting and the Jeep's escape were captured on video surveillance footage from two nearby homes. Love and Brown initially told police that they did not know who the shooter was, but they eventually identified defendant as the shooter, both before and at trial. Police also discovered that defendant was associated with a white Jeep that resembled the car used in the shooting, and additional evidence placed defendant in the vicinity of the crime.

After a five-day jury trial, defendant was convicted as stated above. Defendant now appeals.

-1-

## II. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

Defendant contends that there was insufficient evidence to prove that he was the shooter. We disagree.

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction unless it is supported by sufficient evidence. See *Jackson v Virginia*, 443 US 307, 316; 99 S Ct 2781; 61 L Ed 2d 560 (1979). The prosecution must produce enough evidence to prove every element of the crime beyond a reasonable doubt. *Id.*

We review sufficiency-of-the-evidence claims de novo. *People v Lowrey*, 342 Mich App 99, 122; 993 NW2d 62 (2022). In conducting the analysis, we "must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citation omitted). This deferential standard requires us to "draw all reasonable inferences and make credibility choices in support of the jury verdict," regardless of "whether the evidence is direct or circumstantial." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id.* (quotation marks and citation omitted).

"Identity is an element of every offense," *People v Bass*, 317 Mich App 241, 263; 893 NW2d 140 (2016) (quotation marks and citation omitted), so the prosecution must always produce enough evidence to prove beyond a reasonable doubt that it was the defendant who committed the crime. But "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). And "this Court has stated that positive identification by witnesses may be sufficient to support a conviction of a crime." *Id.*

In this case, there was ample evidence from which a rational trier of fact could find beyond a reasonable doubt that defendant was the shooter. As stated, both survivors of the shooting—Love and Brown—identified defendant as the shooter. They were both in Love's car as the shooter leaned his upper body out of the Jeep, said, "Hey, my n****r," and fired. A rational jury could have believed their testimony and concluded that defendant was the shooter.

Defendant argues that the identification testimony was flawed because Love and Brown could have seen the shooter only briefly and initially did not identify him to the police. But these complaints largely amount to a question of whether Love and Brown's testimony was credible, a determination we leave solely to the jury. *Davis*, 241 Mich App at 700. It is true that Love and Brown had only a couple seconds to see the shooter. But both insisted at trial that they knew defendant was the shooter. Love said that he was "good with faces." And the shooter likely caught their attention by speaking and leaning out of the Jeep. Although neither Brown nor Love knew defendant well and both agreed that defendant did not have especially distinguishing features, both had seen defendant before in person and on social media. So the jury was free to believe Love and Brown's testimony that they were able to identify defendant as the shooter during this brief window of time.

It is also true, as defendant states, that neither Love nor Brown identified the shooter to the police on the night of the shooting; they told the police that the shooter was wearing a mask and that they did not know who it was. At trial, Love and Brown both testified that they initially lied to the police because they did not want to get involved. Love lied again about the shooter's identity when questioned pursuant to an investigative subpoena in October; Brown identified defendant as the shooter when he was subpoenaed. Love eventually identified defendant as the shooter after another interview with the police in February 2022. Again, the jury was free to believe Love and Brown's testimony that they initially lied because they did not want to get involved but that they knew all along that defendant was the shooter.

There was also significant additional evidence presented that corroborated Love and Brown's identification testimony and circumstantially linked defendant to the crime. Myanna Mackie, defendant's friend, testified that on the day and time in question she saw Love drive by in the direction of the decedent's house and told defendant (over the phone) that she had seen Love drive by. A short time later, defendant came to Mackie's location seated in the front passenger seat of a white Jeep. Mackie had seen defendant in the same white Jeep before that day. After Mackie and defendant spoke briefly, defendant drove away from Mackie in the same direction Love had driven earlier. Love's car was parked no more than a block away from Mackie's location. Just a few seconds later, Mackie heard two gunshots coming from the direction in which defendant had just driven.

Additionally, using the video surveillance footage, the police identified several distinguishing features of the Jeep from which the shots were fired which they were able to link to defendant. Although police could not ascertain the Jeep's license plate number, the video appeared to show that the Jeep had no sunroof, tinted driver's and front passenger's windows, a sticker on the lower driver's side of the windshield, blackout rims, black badging on the car itself and its Michigan license plate, and a black placard. Police then discovered that both defendant and a white Jeep Grand Cherokee were associated with the same address on Kalamazoo Avenue. Defendant admitted to police that he had driven that Jeep before. And a couple months before the shooting, defendant made a Facebook post showing defendant standing in front of a white Jeep that resembled the car involved in the shooting. Like the shooter's Jeep, the Jeep in defendant's post had black badging and a sticker on the driver's side corner of the windshield. Upon discovering that the Jeep associated with the Kalamazoo Avenue address was at a vehicle recovery lot, police went to the lot to inspect the vehicle. They noticed many of the same features that distinguished the shooter's Jeep, namely the black badging, no sunroof, tinted driver's and front passenger's windows, and a sticker on the driver's side corner of the windshield. Furthermore, the Jeep at the lot contained paperwork in defendant's name.

Together, this additional evidence corroborated the eyewitness testimony. And considering all the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the jury's verdict, there was ample evidence from which a rational jury could find that defendant was the shooter. *Lowrey*, 342 Mich App at 122; *Nowack*, 462 Mich at 400. Therefore, defendant's sufficiency-of-the-evidence claim fails.

## B. PROSECUTORIAL MISCONDUCT

Next, defendant contends that he was denied a fair trial because the prosecutor misstated the evidence by saying in his closing argument that defendant told Mackie that he intended to kill Love. We disagree.

Claims of prosecutorial misconduct are reviewed de novo "to determine whether [the] defendant received a fair and impartial trial." *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). These claims must be examined in context. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). Prosecutors are generally given "great latitude regarding their arguments and conduct." *People v Cooper*, 309 Mich App 74, 90; 867 NW2d 452 (2015). "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *Watson*, 245 Mich App at 588. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (citations omitted).

At trial, defendant's cousin, Brooklyn Matthews, testified that Mackie called her after the shooting and told her that Love had been shot. During the prosecutor's closing argument, the following exchange occurred:

> [*Prosecutor*]: . . . And common sense tells you—this is again where you can use your common sense—that Mackie—that defendant told Mackie [his] intent and that intent was to shoot and kill [Love]. Otherwise, why would Mackie call Brooklyn Matthews, [defendant's] cousin, and tell her that defendant just shot [Love] right after the shooting?

> [*Defense Counsel*]: Objection, your Honor. That's not what was said during the testimony.

> [*Prosecutor*]: Absolutely was.

> \* \* \*

> *The Court*: I will instruct the jury the lawyers' statements and arguments and any commentary are not evidence. They are only meant to help you understand the evidence and each side's legal—legal theories. You should only accept things the lawyer—accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge. In other words, you'll have to recall the testimony and figure out what that is.

On appeal, defendant argues that the prosecutor misstated the evidence by saying that defendant told Mackie that he intended to kill Love. But that is not exactly what the prosecutor said. The prosecutor told the jury to "use [their] common sense" to *infer* that defendant told Mackie that he intended to kill Love, suggesting that such an inference should be drawn from the evidence presented at trial that Mackie called Matthews after the shooting to tell her that defendant had shot Love. As the prosecutor later elaborated:

-4-

I submit to you, if you remember what Ms. Matthews testified to, she got a phone call from Ms. Mackie shortly after [the shooting]. Ms. Mackie said to Ms. Matthews, "[Love] just got shot." How would she know that? According to her testimony, she couldn't see the car. . . . Well, how would she know [Love] got shot if [defendant] didn't tell her when he pulled up next to her car and had that conversation? Because he did. And that was his intent. His intent was—was clear all along.

Considered in context, the prosecutor's remarks were supported by the evidence. See *Watson*, 245 Mich App at 586, 588. Mackie testified that, shortly before the shooting, she and defendant spoke about Love. Matthews testified that, shortly after the shooting, Mackie told her that Love had been shot—even though there was no evidence that Mackie saw the shooting. Therefore, the jury could reasonably infer that defendant told Mackie he was going to shoot Love. Accordingly, no prosecutorial misconduct occurred.

Furthermore, the trial court instructed the jury, right after the challenged remarks and in response to defense counsel's objection, that the attorneys' arguments were not evidence. In context, this curative instruction was sufficient to alleviate any prejudicial effect that the prosecutor's remarks could have had. See *Unger*, 278 Mich at 235. Therefore, the prosecutor's statements did not deprive defendant of a fair and impartial trial. See *Ackerman*, 257 Mich App at 448.

Affirmed.

/s/ Mark T. Boonstra
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin